# NO. 18-3581

# In the
# United States Court of Appeals
# for the Eighth Circuit

Thomas Rhodes,

*Appellant,*

vs.

Michelle Smith, Warden,

*Appellee.*

Appeal from the United States District Court
for the District of Minnesota
Case No.: 17-cv-4025-JNE-BRT

## APPELLANT'S OPENING BRIEF AND ADDENDUM

Mark R. Bradford (#335940)
BASSFORD REMELE, P.A.
100 South 5th Street, Suite 1500
Minneapolis, MN 55402
(612) 333-3000

Samuel L. Lockner (#341095)
Alexandra J. Olson (#390145)
CARLSON, CASPERS, VANDENBAUGH,
LINDQUIST & SCHUMAN, P.A.
225 South 6th Street, Suite 4200
Minneapolis, MN 55402
(612) 436-9600

*Attorneys for Appellant*

Matthew Frank (#021940X)
Assistant Attorney General
445 Minnesota Street, Suite 1800
St. Paul, MN 55101
(651) 757-1448

*Attorneys for Appellee*

## SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT

On July 7, 2017, this Court concluded that Appellant Thomas Rhodes presented *prima facie* evidence that his state-court murder conviction was unconstitutional and granted Mr. Rhodes' Application for Leave to File a Successive Petition for Writ of Habeas Corpus. The Magistrate Judge recommended that the District Court deny the petition. Nevertheless, the Magistrate Judge also recommended that the District Court grant Mr. Rhodes a Certificate of Appealability because Mr. Rhodes "made a substantial showing of the denial of a constitutional right." (Add.43.)

The District Court adopted the Report and Recommendation. Though the Court declined to issue a Petition for Writ of Habeas Corpus, it granted the Certificate of Appealability, observing that "[r]easonable jurists could find it debatable whether the Court's procedural ruling is correct." (Add.49.)

Mr. Rhodes appeals because he has established by clear and convincing evidence that, but for the constitutional errors, no reasonable jury would have convicted him. In the alternative, Mr. Rhodes appeals because the District Court erred in denying an evidentiary hearing.

Mr. Rhodes requests oral argument and suggests that 20 minutes for each side would be appropriate.

# TABLE OF CONTENTS

Page

SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT ................... i

TABLE OF AUTHORITIES ................................................................... iv

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF ISSUES ................................................................... 2

STATEMENT OF CASE ...................................................................... 3

    I.     Jane Rhodes' death ............................................................ 3

    II.    Dr. Michael McGee ........................................................... 8

    III.   Patrol Captain William Chandler ...................................... 14

    IV.   Procedural history............................................................. 17

SUMMARY OF ARGUMENT ............................................................. 21

ARGUMENT ..................................................................................... 22

    I.     Legal standard .................................................................. 22

    II.    Mr. Rhodes has clearly and convincingly established that, but for the constitutional violations, no reasonable factfinder would have convicted him.................................................. 24

        A.    Captain Chandler's testimony was indisputably false ............. 25

        B.    Advances in scientific understanding demonstrate that Dr. McGee's testimony was wrong ........................................ 26

        C.    The false testimony violated Mr. Rhodes' due process rights........................................................................... 28

        D.    With the truth in hand, no jury would convict ........................ 32

        E.    The District Court's rationale in denying the petition is erroneous ................................................................. 36

CONCLUSION .................................................................................. 41

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) .................................... 42

APPELLANT'S CERTIFICATION OF VIRUS FREE......................................... 43

# <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>:**

*California v. Trombetta*,
   467 U.S. 479 (1984) ............................................................................22

*Ex Parte Henderson*,
   384 S.W.3d 833 (Tex. Crim. App. 2012)........................................ 30, 31

*Giglio v. United States*,
   405 U.S. 150 (1972) .........................................................................2, 32

*Gimenez v. Ochoa*,
   821 F.3d 1136 (9th Cir. 2016)...............................................................29

*Hansen v. State*,
   No. 23-KX-04-1222, 2011 Minn. Dist. LEXIS 197
   (Minn. Dist. Ct. July 13, 2011) ........................................................8, 34

*Hanson v. Farwell*,
   No. 3:04-cv-00130, 2017 U.S. Dist. LEXIS 86316
   (D. Nev. June 6, 2017) ..........................................................................29

*Harris v. Nelson*,
   394 U.S. 286 (1969) ..............................................................................23

*Lee v. Tennis*, No, 4:CV-08-1972,
   2014 WL 3894306 (M.D. Pa. Aug. 8, 2014)..................................... 28, 29

*Lee v. Glunt*,
   667 F.3d 397 (3d Cir. 2012)..................................................................29

*Lee v. Superintendent Houtzdale SCI*,
   798 F.3d 159 (3d Cir. 2015)...............................................................2, 22

*Rhodes v. Dingle*,
   Civ. No. 08-198, 2008 WL 482362 (D. Minn. Jan. 24, 2008)...........17

*Rhodes v. Fabian*,
   Civ. No. 04-176, 2005 WL 2704896 (D. Minn. Sept. 12, 2005)........17

*Rhodes v. State*,
875 N.W.2d 779 (Minn. 2016).................................................................. *passim*

*Schlup v. Delo*,
513 U.S. 298 (1995) ........................................................................2, 39

*State v. Rhodes*,
657 N.W.2d 823 (Minn. 2003).......................................... 3, 16, 19, 33

*State v. Zimmerman*,
669 N.W.2d 762 (Wis. Ct. App. 2003) ..............................................35

*Sweet v. Delo*,
125 F.3d 1144 (8th Cir. 1997)...........................................................22

*United States v. Young*,
17 F.3d 1201 (9th Cir. 1994)................................................ 2, 22, 32

*Williams v. Taylor*,
529 U.S. 420 (2000) .........................................................................44

## **Other:**

28 U.S.C. § 2244(b) (2012) ...............................................................17

28 U.S.C. § 2253(c)(1).........................................................................1

28 U.S.C. § 2253(c)(2).......................................................................19

28 U.S.C. § 2254 ................................................................................23

28 U.S.C. § 2254(a) ........................................................................2, 22

28 U.S.C. § 2254(e)(2)................................................................. *passim*

28 U.S.C. § 2255...................................................................................1

Fed. R. App. P. 4(1)(a)..........................................................................1

## JURISDICTIONAL STATEMENT

28 U.S.C. § 2253(c)(1) provides that an appeal may be taken from a "final order" denying a habeas petition under 28 U.S.C. § 2255 if the "judge issues a certificate of appealability." On October 29, 2018, the District Court issued an Order denying the habeas petition but granting a Certificate of Appealability. (Add.49-50.) On October 30, 2018, the clerk entered judgment on Mr. Rhodes' petition. On November 27, 2018, Mr. Rhodes filed a timely Notice of Appeal. (Docket No. 30.) *See* Fed. R. App. P. 4(1)(a) (Notice of Appeal must be filed within 30 days after entry of judgment).

# <u>STATEMENT OF ISSUES</u>

1.   Did the District Court err in denying Mr. Rhodes' Petition for Writ of Habeas Corpus when, among other things, Mr. Rhodes submitted clear and convincing evidence that, but for constitutional violations, no reasonable factfinder would have convicted him of the underlying offense?

   **Most Apposite Authority:**

   28 U.S.C. § 2254(a);

   *Giglio v. United States*,
      405 U.S. 150, 154 (1972);

   *Lee v. Superintendent Houtzdale SCI*,
      798 F.3d 159 (3d Cir. 2015);

   *United States v. Young*,
      17 F.3d 1201 (9th Cir. 1994).

2.   Did the district court err in denying Mr. Rhodes an evidentiary hearing on his Petition for Writ of Habeas Corpus when, among other things, that denial was based, in significant part, on purported equivocations in expert affidavits Mr. Rhodes offered and Mr. Rhodes has never been afforded an evidentiary hearing or other opportunity to develop the factual record?

   **Most Apposite Authority:**

   28 U.S.C. § 2254(e)(2);

   *Schlup v. Delo*,
      513 U.S. 298 (1995).

# STATEMENT OF CASE

On July 29, 1998, a Minnesota state jury convicted Thomas Rhodes of first- and second-degree murder in connection with the death of his wife, Jane Rhodes. Mr. Rhodes has spent 20 years in prison, all the while maintaining his actual innocence.

## I.     Jane Rhodes' death.

The State's case was, by all accounts, "wholly circumstantial." *State v. Rhodes*, 657 N.W.2d 823, 827 (Minn. 2003). On August 2, 1996, the Rhodes family was vacationing on Green Lake in Spicer, Minnesota. (Appx.68.) That evening, Thomas Rhodes asked his son, Eric, to set an alarm so they could go fishing the next morning. (Appx.69.)

Mr. Rhodes and his wife, Jane, then took their new Baja Blast jet boat onto the lake, as they had the night before. (*Id.*) Witnesses testified they could hear the couple having fun:[1]

- John Iverson testified that he observed Thomas and Jane "whooping it up, like having fun out there." (Appx.25.)

- Paul Bolle testified that, based on what he heard from the shore, his "impression was at the time they were just having

---

[1] One witness—Andrea Iverson—testified that she heard a woman's voice say: "Stop. No. It hurts." (Appx.26.) But Ms. Iverson conceded that, at the time she heard that voice, the boat was doing "sharp circles." (Appx.27.) Mr. Rhodes obviously could not have been simultaneously operating the boat *and* assaulting his wife.

fun, hooting and hollering, just kinda partying it up." (Appx.29.)

- Kristi DeRung testified that she heard laughter coming from the Rhodes' boat. (Appx.32.)

- Karen DeRung testified that she heard the couple screaming and laughing. (Appx.33.) In particular, she testified that Jane Rhodes was laughing. (Appx.34.)

According to Mr. Rhodes, after some time, the couple decided to move to a different part of the lake. As Mr. Rhodes accelerated to "plane out" the boat,[2] his wife stood up to search for an earring she dropped. (Appx.16-18, 37.) The couple's son, Eric, testified that his mother would often lose earrings because "[s]he would fiddle with them." (Appx.70.) As Jane was searching for the earring, Mr. Rhodes glanced back and saw that she had fallen into the water. (Appx.16-17.)

Mr. Rhodes turned the boat around and began frantically circling (in the dark) searching for his wife. Witnesses confirmed that they saw the boat doing circles in the same general area, "almost like a figure eight." (Appx.28, 30-31 (witness testifying that he saw the boat "making oblong circles" with all of its lights on).) Mr. Rhodes eventually jumped into the water in a panic, and then discontinued his search after about 20 minutes and hurried back to the hotel where his family was staying to get help. (Appx.18-19, 50.)

---

[2] "Plane out" refers to having the boat ride flat in the water as opposed to having the front ride higher than the rear, which happens when a jet boat travels slowly.

Brian Hunter, another vacationer on Green Lake, had been sitting on the beach with his girlfriend, and saw the Rhodes' boat driving in circles about 200 yards from shore. (Appx.73-74.) Mr. Hunter watched the boat speed to the shore, where the driver quickly "beached" the boat, jumped out, and ran toward the hotel so fast he was "almost tripping forward because his feet couldn't keep up with how fast he was moving." (Appx.75-76.) Mr. Hunter went inside the hotel and saw Mr. Rhodes in the lobby. (Appx.76-78.) Mr. Rhodes was trying to tell the clerk something, but he was talking so fast that it was difficult to understand what he was saying. (Appx.76-77.) Mr. Rhodes was soaking wet, shaking, and frantic; he appeared to be "out of his mind." (Appx.75-76.)

Norm Westby, a clerk at the hotel, was working when, at about 1:00 a.m., Mr. Rhodes came in from the lake, soaked from "head to toe," and talking "like huge sobs were trying to get out." (Appx.54-56, 59-60.) Mr. Westby testified that Mr. Rhodes was "just beside himself;" his face was contorted, and he looked like he was going to vomit. (Appx.62.) At first, Mr. Westby could not fully understand Mr. Rhodes, but he called 911 when he realized that Mr. Rhodes was saying that his wife had fallen into the lake. (Appx.56-57.)

Randall Kveene, a detective with the Kandiyohi County Sheriff's Department, arrived ten minutes later. (Appx.13-14, 58.) Mr. Rhodes ran out to meet Deputy Kveene and implored him "to go fast to help [his] wife" because she

had fallen in the lake. (Appx.14-16.) Mr. Rhodes was frantic, desperate, and shaken. (Appx.21, 42, 46.) Accordingly, he had trouble explaining the exact location where Jane had fallen in. Perry Weiland, a volunteer EMT, also assisted with the search. (Appx.41-42, 45.) Mr. Weiland recalled that Mr. Rhodes appeared confused, as if he did not really know where he was or where Jane fell in. (Appx.46.) Likewise, another first responder, David Strom, wrote in his report that Mr. Rhodes "was very upset . . . and somewhat confused as to where this incident had occurred." (Appx.47-49.)

Police searched the general area of the lake where Mr. Rhodes believed his wife entered the water for about 90 minutes but had to stop because of "limited visibility." (Appx.37, 43.) Strong winds also hampered search efforts. One officer who was on the scene testified: "The wind velocity made it to the point where the [search] dogs could not find the scent because of the speed of the wind." (Appx.44.)

Police resumed searching at 7:00 a.m. the next morning. (Appx.38.) Windy conditions persisted. Kermit Olson, a fisherman who was on the lake that morning, stated: "[I]t was so windy, I think we were the only ones out there." (Appx.35.) Mr. Olson testified that he and his son were initially fishing in the area where search-and-rescue efforts were underway, but they decided to move away from the

6

Sheriff, and instead "drift all the [way] down the lake with the wind, staying with the wind." (*Id.*)

Between 1:00 p.m. and 1:30 p.m. that afternoon, Mr. Olson saw Jane's body floating in shallow water near the shore, less than a mile from where Mr. Rhodes told police his wife fell into the water. (Appx.36, 39.) Michael Roe, a water safety officer for the Kandiyohi County Sheriff's Department, testified that he was not surprised they found the body in that area because of the wind. (Appx.43.)

Authorities conducted an extensive forensic examination of the Rhodes' boat, looking for any indications of an assault. The Bureau of Criminal Apprehension chemically tested the entire boat for blood and other fluids. (Appx.51.) All tests were negative. (*Id.*) The BCA also sprayed luminol to try to discover even the faintest blood spatters. (Appx.52.) That test, too, detected no presence of blood. (*Id.*) As the BCA technician agreed, "everything that could be done with existing technology [was] done to detect blood on this boat." (*Id.*) None was found. What investigators did find, however, was Jane's earring on the boat's floor. (Appx.22-23.)

Despite all of this, the State charged Mr. Rhodes with first- and second-degree murder—more than a year after Jane's death. The State alleged that Mr. Rhodes choked his wife, and then threw her into Green Lake.

## II.     Dr. Michael McGee.

With respect to Jane's injuries, the State relied on Dr. Michael McGee, whose false or incorrect testimony has led at least two different courts in Minnesota and Wisconsin to order new trials for other wrongfully convicted persons.[3]

Dr. McGee testified that "Mrs. Rhodes [had] a series of soft tissue hemorrhages inside her neck region." (Appx.9.) He said that the force had to be enough to cause "breakage of the blood vessels" in three different areas and, in turn, "cause the hemorrhage to occur." (Appx.11.)

It is undisputed, however, that Jane's neck was "clear" of *external* signs of choking or other trauma. Dr. McGee testified:

> Q:     Were there any marks on the outside of Mrs. Rhodes neck that would correspond to these internal injuries?
>
> A:     The neck is clear.

(Appx.10.) Simply put, then, this conviction is based almost entirely on the premise that a person can violently choke or strike a person in the neck with

---

[3] *See Hansen v. State*, No. 23-KX-04-1222, 2011 Minn. Dist. LEXIS 197, at *16 (Minn. Dist. Ct. July 13, 2011) (granting a new trial and reasoning: "Dr. McGee's testimony regarding the symptoms and clinical course of a child with a skull fracture . . . was false or incorrect."); *State v. Zimmerman*, 669 N.W.2d 762, 772 (Wis. Ct. App. 2003) (reversing murder conviction and ordering new trial, noting that even the sitting Milwaukee Medical Examiner disagreed with Dr. McGee's medical opinion).

enough compressive force "to cause breakage of the blood vessels," while leaving no external signs of trauma (such as bruising).

To support this allegation, Dr. McGee testified that the hemorrhages on the *interior* of Jane's neck were consistent with a hand used "in the V position," indicating Mr. Rhodes choked his wife. (Appx.12.) As one Minnesota Supreme Court Justice observed, Dr. McGee's opinion that Jane's neck hemorrhaging was caused by external force (such as choking) "was the most critically incriminating evidence of the entire trial." *Rhodes*, 875 N.W.2d at 793 (Anderson, J., dissenting). And the State contended from the outset of the case—in its opening statement— that internal neck hemorrhaging is *not* consistent with natural drowning. (Appx.8.) That theory culminated in the State's closing argument, where the State reinforced its position that Thomas Rhodes "knock[ed] his wife out of the boat *with a blow to the neck*, causing those soft tissue injuries that Dr. McGee testified about, injuries that he testified *had to be caused* by the brief application of compressive force to the neck." (Appx.71 (emphasis added).)

Notably, during a post-trial hearing in 2001, Dr. McGee stuck to his opinion regarding Jane's internal hemorrhages because, in his view, then-available medical literature established that the natural drowning process may often result in injuries to internal neck muscles, but did not establish that drowning could result in internal

hemorrhages in the soft tissue. After noting that Jane's internal neck injuries were predominantly soft tissue, Dr. McGee testified:

> Q:  Why is that significan[t] in ruling out overexertion and hyperextension as a cause of these injuries?
>
> A:  Because, *if I understand the articles* that are put— that I have reviewed, they talk about hemorrhage being presented in the musculature that can be seen[,] and the injuries seen at the time of the autopsy were not confined to the muscle [and were] actually in wider-ranging areas of the neck area, including soft tissues adjacent to the muscle as well as surrounding the tips of the hyoid bone and at the back of the neck area that are not described [in the literature].

(Appx.78 (emphasis added).)

Recent peer-reviewed medical literature, however, shows that Dr. McGee's conclusions that internal soft tissue injuries in Jane Rhodes' neck had to have been caused by compressive forces (such as choking), and could not be caused by the natural drowning process, are wrong. Studies published in 2009 (Pollanen, *et al.*)[4] and 2011 (Alexander & Jentzen)[5] refute the previously accepted science that

---

[4] Michael S. Pollanen, S. D. Channa Perera, and David J. Clutterbuck, *Hemorrhagic Lividity of the Neck: Controlled Induction of Postmortem Hypostatic Hemorrhages*, AM. J. FORENSIC MED. & PATHOL., Vol 30, No. 4 (Dec. 2009). Dr. Pollanen, who led the study, is the Chief Forensic Pathologist for Ontario, Canada. (Appx.80.)

[5] Russell T. Alexander and Jeffrey M. Jentzen, *Neck and Scleral Hemorrhage in Drowning*, J. FORENSIC SCI. Vol. 56, No. 2 (Mar. 2011). (Appx.86.)

internal neck hemorrhages—like the ones Jane Rhodes exhibited—cannot occur as a result of natural drowning.

The Pollanen study, for example, concluded that, when a body is angled downward in the water—which is common in drowned bodies—extravascular rupture and leakage from blood vessels due to gravitational pressure after death can cause "pseudo bruises" in the interior soft tissue of the neck that lead to "*misidentification of violent neck injury*." (Appx.80 (emphasis added).) The researchers were able to reproduce (in numerous cadavers) hypostatic hemorrhages "in the soft tissues of the anterior neck and strap muscles" that "mimic soft tissue injury ('pseudo bruising') and the internal injuries related to strangulation." (*Id.*)

More than a year later, the Alexander & Jentzen study established that internal neck hemorrhaging can also occur *before* death, as a drowning person struggles to stay above water. As that study noted, for years the accepted science was interior neck hemorrhages "which are often seen in cases of strangulation do not occur in drowning and should always raise the suspicion of foul play." (Appx.88 (quoting Spitz, DJ, *Investigation of Bodies in Water*, SPITZ AND FISHER'S MEDICOLEGAL INVESTIGATION OF DEATH (4th ed. 2006)).) The study, however, showed internal neck hemorrhaging can in fact be caused by "elevated central venous pressure" and rupture of congested blood vessels caused by natural drowning reactions, such as coughing and abdominal contractions. (Appx.89.)

These critical studies were not available in 1998 when Mr. Rhodes was convicted based on Jane's internal neck hemorrhages and the scientific belief—as the prosecutor put it—that such hemorrhages would not be "consistent with drowning." (Appx.8.) And they were not available in 2001, when Mr. Rhodes first sought post-conviction relief in state court, or in 2004, when Mr. Rhodes first petitioned for habeas corpus relief in federal court.

Since this shift in the science, numerous expert pathologists from across the country have extensively reviewed this case (without charge). They include: the Chief Medical Examiner for Miami-Dade County, Florida (Dr. Bruce Hyma); the Chief Medical Examiner for Duval County, Florida (Dr. Valerie Rao); a Professor of Pathology at the University of Michigan and co-author of the Alexander & Jentzen study (Dr. Jeffrey Jentzen); the Chair of the Department of Forensic Sciences at George Washington University (Dr. Victor Weedn); a Harvard-educated pathologist from San Francisco, California (Dr. Judy Melinek); a forensic pathologist and former professor at the University of Miami (Dr. Ronald Wright), and a forensic pathologist from Seattle, Washington (Dr. Carl Wigren).

*These experts all agree* that science now definitively demonstrates that Dr. McGee's opinions about the cause of Jane's internal neck hemorrhages were wrong. Their opinions include:

- "I would not consider this death a homicide." (Appx.92.)

- "The hemorrhages in the neck do not appear to have been caused by external pressure. Neck hemorrhages can occur during the drowning process and floating face down can cause blood to accumulate in neck tissues." (*Id.* (citing Pollanen and Alexander & Jentzen).)

- "Other injuries to the face and head appear to be postmortem. The injuries to the mouth appear to be typical aquatic animal activity." (*Id.*)

- "Abrasions on Jane Rhodes's face and hands were typical of postmortem injuries commonly seen in drowning victims." (Appx.104.)

- "Recent scientific literature supports my conclusion that the hemorrhages in Jane Rhodes' neck could be attributable to something other than external pressure." (Appx.105 (citing Pollanen and Alexander & Jentzen).)

- "The autopsy report and photographs did not suggest signs of a struggle. It is my opinion that all of the injuries can be attributed to postmortem artifacts on a submerged body." (Appx.115.)

- "In my opinion, the hemorrhages in Mrs. Rhodes' neck could have occurred during the drowning process or post-mortem, as opposed to pre-mortem external pressure." (Appx.116.)

- "I do not believe that there is evidence of trauma." (Appx.151.)

- "Dr. McGee misinterpreted postmortem artifacts, specifically livor mortis and postmortem trauma, as antemortem injuries." (*Id.*)

- "[T]here were no . . . injuries of the head consistent with head trauma." (Appx.152.)

- "There were no markings of the external neck to correlate with such internal injury. I do not agree that the intramuscular hemorrhage is specific to trauma." (*Id.*)

- "Another explanation for the presence of neck hemorrhage at autopsy is the phenomenon of postmortem hypostatic hemorrhage described in a recent paper (Pollanen, 2009). This is a process whereby blood pools due to gravity (lividity) . . . . Hypostatic hemorrhage of the neck soft tissue including muscles may be misinterpreted as blunt force injury to the neck." (Appx.177.)

- "The defects on Jane Rhodes face are explained by a combination of postmortem artifact ('travel abrasions'), probable animal scavenging, and draining of perimortem subgaleal hemorrhage from the top of her scalp forward into forehead and eyelids." (Appx.185.)

- "These [neck] hemorrhages are not consistent with blunt force injury to the neck but rather the active process of drowning." (Appx.178.)

- "The bleeding in Jane Rhodes's neck was postmortem extravasation (leakage of blood from blood vessels), which is also common in drowning victims." (Appx.216.)

- "There is new scientific literature that supports my conclusion that the hemorrhages in Jane Rhodes's neck were postmortem." (*Id.* (citing Pollanen and Alexander & Jentzen).)

- "It is therefore my opinion that the manner of death in this case should have been classified an accident." (Appx.231.)

In contrast, the State has never identified a single expert willing to support Dr. McGee's conclusions in light of the recent shift in the science and medical literature regarding this subject.

## III.  Patrol Captain William Chandler.

To bolster Dr. McGee's incorrect testimony, the State relied on the objectively false testimony of Captain William Chandler. The State used Captain

Chandler's testimony to demonstrate that Mr. Rhodes deliberately misled first responders about where Jane entered the water. *See Rhodes*, 657 N.W.2d at 829 (observing that "[t]he State offered the testimony of Patrol Captain William Chandler of the Hennepin County Sheriff's Office to support the theory that Rhodes intentionally misdirected the authorities").

Captain Chandler testified that drowned bodies sink quickly, and will only resurface once they regain buoyancy from internal biological reactions. (Appx.63, 64.) Captain Chandler explained that cold water slows down the biological process, resulting in longer resurfacing times. (Appx.64.)

To that end, Captain Chandler testified that the area of Green Lake where Mr. Rhodes told police his wife fell into the water is 40-feet deep and, at that depth, the temperature is "about 39.2 degrees at most." (Appx.66; *see also* Appx.64-65.) Captain Chandler testified that, at that depth, it would take a body three-to-four weeks to resurface. (Appx.67.) He told the jury his opinion was based on the colder water temperature:

> Q: What are the reasons for that opinion, Captain?
>
> A: *The biggest reason is the temperature*. It's like the bottom of a lake is colder . . . than a medical examiner's refrigerator, and it's going to preserve a person that's down there, and take considerable time on its own to refloat.

(*Id.* (emphasis added).)

Captain Chandler went on to testify that, because Jane's body was discovered floating near the shore line 13 hours after she entered the lake, she must have drowned and resurfaced in shallower water (*i.e.*, not in the area where Mr. Rhodes directed first responders):

> Q:     Now, if Jane Rhodes – if you were told that Jane Rhodes had surfaced within 13 hours of dying by drowning in a Minnesota lake, do you have an opinion as to the deepest she could have sunk?
>
> A:     Yes, I do.
>
> Q:     What is that opinion?
>
> A:     Ten feet or less.
>
> Q:     And what are the reasons for that opinion?
>
> A:     Again, *it's because of the temperature*.

(*Id.* (emphasis added).)

Captain Chandler's testimony allowed the State to argue that Mr. Rhodes deliberately misled police about the location where Jane Rhodes entered the lake, suggesting guilt. *See State v. Rhodes*, 657 N.W.2d 823, 840-41 (Minn. 2003) (emphasis added) (noting the "state's theory that Rhodes lied to the officials about the correct location to search"). But it is now undisputed that Captain Chandler's testimony about the water's temperature was false.

In 2013, the Innocence Project discovered that the Department of Natural Resources actually studied Green Lake *in August 1996*—the same month and year

Jane drowned—and recorded that the temperature at a 40-foot depth was *69 degrees*, not 39 degrees as Chandler testified. (Appx.241.) The DNR, however, did not publish this information until eight years after Mr. Rhodes was convicted, and two years after he first moved for habeas relief. (Appx.239.)

## IV. Procedural history.

Mr. Rhodes has always maintained his innocence. And he has diligently sought post-conviction relief.

On January 26, 2004, before the evidence at issue here even existed, Mr. Rhodes filed his first petition for a writ of habeas corpus in Minnesota federal District Court. *See Rhodes v. Fabian*, Civ. No. 04-176, 2005 WL 2704896 (D. Minn. Sept. 12, 2005). That petition—which was based substantially on the ineffective assistance of counsel Mr. Rhodes received, and challenges to the sufficiency of the State's evidence—was denied.

On January 22, 2008, Mr. Rhodes filed a second habeas petition (*pro se*). *See Rhodes v. Dingle*, Civ. No. 08-198, 2008 WL 482362 (D. Minn. Jan. 24, 2008). The District Court denied that petition because Mr. Rhodes filed without first obtaining express permission from the Eighth Circuit, as is required by 28 U.S.C. § 2244(b) (2012).

On November 27, 2012, Mr. Rhodes filed another petition for post-conviction relief in state court. *See Rhodes v. State*, 875 N.W.2d 779, 783 (Minn.

2016). While that petition was on appeal, the Minnesota Supreme Court granted Mr. Rhodes a stay so he could consult with the Innocence Project and, if warranted, file a revised post-conviction petition. Mr. Rhodes filed that revised petition on March 21, 2014. *Id.* at 784.

The revised petition was based on information the Innocence Project discovered in late 2013 (and into 2014), including a 2006 DNR study which demonstrated that the State offered false testimony to convict Mr. Rhodes. That false testimony was unquestionably material to the outcome. It was the only evidence the State offered to show that Mr. Rhodes intentionally misled first responders.

The revised petition also included scientific studies published in 2009 and 2011 that demonstrate that the decedent's neck hemorrhages were not caused by blunt trauma, and opinions from seven experts from across the country who conclude based on those studies that the death for which Mr. Rhodes was convicted was not a homicide at all.

The state district court declined to hold a hearing, so Mr. Rhodes has never received a hearing on any of this new evidence. The Minnesota Supreme Court finally resolved the petition by a split decision dated February 17, 2016. In a dissenting opinion, Justice G. Barry Anderson (joined by Justice David L. Lillehaug), concluded: "The scientific evidence presented by Rhodes, when

considered as true and in the light most favorable to the petition, alleges issues of material fact regarding Rhodes's newly-discovered evidence claim, which must be resolved at an evidentiary hearing." *Rhodes*, 875 N.W.2d at 779 (Anderson, J., dissenting).

Mr. Rhodes then applied to this Court for permission to file a successive habeas petition. This Court granted that Petition on July 7, 2017, concluding that Mr. Rhodes had presented *prima facie* evidence that his state-court murder conviction was unconstitutional. (Appx.5.)

Mr. Rhodes then filed his petition with the federal District Court. The Magistrate Judge recommended that the petition be denied. Notably, though, in evaluating whether Mr. Rhodes presented sufficient evidence to warrant habeas relief, the Magistrate improperly considered an affidavit from the State's only medical expert, Dr. Michael McGee, in which Dr. McGee attempted to rebut Mr. Rhodes' new medical evidence. The court also weighed conflicting evidence. (Add.33.)

Nevertheless, the Magistrate recommended that the District Court issue a Certificate of Appealability, which is authorized "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Magistrate concluded that "jurists of reason could find it debatable that Petitioner cannot meet the demanding standard [for federal habeas relief], which

requires clear and convincing evidence of innocence." (Add.43-44 (internal quotations omitted).)

Mr. Rhodes objected to the Report and Recommendation. The State also objected to the Report and Recommendation in as much as it recommended a Certificate of Appealability. The District Court overruled the objections and adopted the Report and Recommendation in full. This appeal followed.

# SUMMARY OF ARGUMENT

The District Court erred in denying Mr. Rhodes' Petition for Writ of Habeas Corpus. Mr. Rhodes' murder conviction was premised on the false and scientifically invalid testimony proffered by the State. Moreover, this false testimony was the *only* evidence the State introduced to prove that a crime was committed, and without this evidence, the State had little to no evidence to support a finding of guilt. The introduction of this demonstrably false evidence permeated the trial, giving undue and unfair credence to weak, circumstantial evidence, and the reliance on this debunked evidence undermined the fundamental fairness of Mr. Rhodes' trial and denied him his right to due process. Mr. Rhodes has submitted clear and convincing evidence that, but for these constitutional violations during his trial, no reasonable factfinder would have convicted him of this crime.

In addition, the District Court erred in denying Mr. Rhodes an opportunity for an evidentiary hearing. The District Court's denial was based on its own weighing and balancing of the evidence submitted by both Mr. Rhodes *and* the State, which was improper. Mr. Rhodes has never been given an opportunity to develop the factual record, yet his Petition for a Writ of Habeas Corpus was denied based on the court's own resolution of evidentiary weight and credibility.

**ARGUMENT**

**I.    Legal standard.**

In reviewing an order denying a Petition for Writ of Habeas Corpus, this Court reviews the District Court's factual findings for clear error and its conclusions of law de novo. *Sweet v. Delo*, 125 F.3d 1144, 1153 (8th Cir. 1997).

Federal habeas relief is available to a petitioner "in custody pursuant to the judgment of a State court" if the person shows "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). To this end, "[a] conviction based in part on false evidence, even false evidence presented in good faith, hardly comports with fundamental fairness." *United States v. Young*, 17 F.3d 1201, 1203-04 (9th Cir. 1994); *see also California v. Trombetta*, 467 U.S. 479, 485 (1984) (recognizing that, under the due process clause, criminal prosecutions must comport with prevailing notions of fundamental fairness). The reason is simple: "[A] government's assurances that false evidence was presented in good faith are [of] little comfort to a criminal defendant wrongly convicted on the basis of such evidence." *Young*, 17 F.3d at 1203.

In addition, as recent decisions illustrate, a conviction based on inaccurate and unreliable scientific evidence also violates the due process clause. *See, e.g., Lee v. Superintendent Houtzdale SCI*, 798 F.3d 159, 162 (3d Cir. 2015). In *Lee*, the Third Circuit framed the pertinent inquiry as whether the "admission of [] expert

22

testimony undermined the fundamental fairness of the entire trial because the probative value of the evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission." *Id.*

The Supreme Court holds courts to a very high standard in reviewing habeas petitions:

> There is no higher duty of a court, under our constitutional system, than the careful processing and adjudication of petitions for writs of habeas corpus, for it is in such proceedings that a person in custody charges that error, neglect, or evil purpose has resulted in his unlawful confinement and that he is deprived of his freedom contrary to law.

*Harris v. Nelson*, 394 U.S. 286, 292 (1969). Indeed, "[i]t is now established beyond the reach of reasonable dispute that the federal courts not only may grant evidentiary hearings to applicants, but *must* do so upon an appropriate showing." *Id.* at 291 (citing *Townsend v. Sain*, 372 U.S. 293, 313 (1963) and *Brown v. Allen*, 344 U.S. 443, 464 (1953)) (emphasis added).

With respect to what constitutes "an appropriate showing," the federal habeas statute, 28 U.S.C. § 2254, amended through the Antiterrorism and Effective Death Penalty Act of 1996, provides that habeas relief is required where:

    (1)    the factual predicate for the habeas claim "could not have been previously discovered through the exercise of due diligence"; and

    (2)    "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that

> but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."

28 U.S.C. § 2254(e)(2).[6]

## II. Mr. Rhodes has clearly and convincingly established that, but for the constitutional violations, no reasonable factfinder would have convicted him.

The foundation for Mr. Rhodes' conviction was formed by two material, interlocking, and mutually reinforcing strains of faulty scientific evidence presented by two experts. Captain Chandler testified falsely on matters of ecology (the temperature of Green Lake, the absence of currents in the lake), which testimony is now demonstrably wrong. The State used that wrong testimony to argue that Thomas Rhodes deliberately impeded the effort to search for his wife. With that incriminating testimony in hand, the State then used the faulty medical conclusions of Dr. McGee to argue that Mr. Rhodes attacked his wife before she drowned. Aside from those two reinforcing false conclusions, there is no evidence

---

[6] The Magistrate's Report and Recommendation (adopted by the District Court) presumed Mr. Rhodes could not have discovered the factual predicate for the habeas petition earlier than he did. Because the State did not appeal, Mr. Rhodes will not address that prong in any detail. Suffice it to say, the evidence upon which Mr. Rhodes relies was not available to him earlier. The Innocence Project discovered the evidence in 2013 and 2014 precisely *because* Mr. Rhodes could not have done so. Mr. Rhodes, who has been in prison for two decades, did not learn of the remote water-temperature evidence (which did not even exist when he was convicted) demonstrating the falsity of Captain Chandler's testimony until late 2013, when the Innocence Project discovered the 2006 DNR report of its 1996 study of Green Lake.

that Mr. Rhodes committed a crime, much less that he was capable of such heinousness. As detailed below, however, both Captain Chandler and Dr. McGee were wrong and there should not have been any such evidence.

### A. Captain Chandler's testimony was indisputably false.

A crucial piece of the State's case was the testimony of Captain William Chandler, which the prosecution used to establish the narrative that Mr. Rhodes had deliberately misled police to thwart rescue efforts.

Captain Chandler testified that the water temperature in Green Lake at a 40-foot depth is, "at most" 39.2 degrees, making it impossible for Jane to have entered Green Lake where Mr. Rhodes told authorities she did and then resurface in time to be discovered thirteen hours later. That testimony is false. *Rhodes*, 875 N.W.2d at 797 (Anderson, J., dissenting) ("[W]e now know that Captain Chandler testified incorrectly at trial regarding the water temperature at a 40-foot depth and the resulting 3-to-4 week resurfacing time.").

Again, DNR temperature readings from August 9, 1996, just seven days after Jane's death, show that the lake temperature in Green Lake was 68.9 degrees, *not* 39 degrees, at a depth of 39.6 feet.[7] One explanation for the mild thermocline is

---

[7] This appears typical for Green Lake. In a 2010 report, the Minnesota Pollution Control Agency reported that Green Lake "does experience slight thermal stratification (drop of 5 to 10 degrees over the 30 meter depth)." *See* https://www.pca.state.mn.us/sites/default/files/wq-ws3-07010204.pdf at 32.

strong currents.[8] Indeed, while lake currents are largely related to wind speed and direction, it appears Green Lake has a current even during times of little or no wind. (*See* Appx.192). Captain Chandler even testified falsely about this, stating that lakes "generally" do not have currents in them. (Appx.63.) Captain Chandler's testimony was indisputably wrong.

> **B. Advances in scientific understanding demonstrate that Dr. McGee's testimony was wrong.**

In addition to Captain Chandler, the State relied on Dr. McGee to further its narrative that Mr. Rhodes struck and choked his wife before pushing her into the lake. Both at trial and at the 2001 post-conviction hearing, Dr. McGee testified that hemorrhages inside Jane's neck were caused by external compression, such as a hand in the "V" position (*e.g.*, a strike or choke), and that Jane sustained antemortem facial injuries.

In the interim, seven independent forensic pathologists reviewed this case and unequivocally concluded that Dr. McGee was wrong in several critical respects. Given the sheer number of experts who disagree with Dr. McGee,

---

[8] *See* http://www.glerl.noaa.gov/pubs/fulltext/2001/20010008.pdf; http://www.des.ucdavis.edu/faculty/Richerson/ESP30/Lectures%2016%20and%20 17.pdf ("Very *strong currents* can erode stratification by creating enough turbulence to destroy thermoclines or greatly weaken them.").

particularly in light of the recent scientific literature, it is clear that his testimony was wrong.

*Every* forensic pathologist who has reviewed this case has concluded that Dr. McGee was wrong in the same numerous respects: Dr. McGee's assertion that Jane's neck hemorrhages were caused by a hand in the "V" position—and not by drowning—was false. All forensic pathologists who reviewed this case agree that the neck hemorrhages were not caused by strangulation. Indeed, more recent medical literature establishes neck hemorrhages are "common postmortem artifacts" that "can lead to the over-diagnosis of injuries to the neck as strangulation." (Appx. 80, 88.) Further, experts agree that the injuries that Dr. McGee testified occurred antemortem were in fact postmortem injuries common in accidental drowning cases. (Appx.92, 104, 115-16, 153, 216.)

The medical experts who reviewed this case did not rely exclusively on their experience; they each independently formed their conclusions based upon their experience in combination with recent scientific literature and studies. Given that seven forensic pathologists disagree with Dr. McGee, and can support their conclusions with substantial—and recent—scientific literature, this Court should be reasonably satisfied that Dr. McGee's testimony was wrong. In fact, since the trial more than 20 years ago, not a single medical expert has come forward to support Dr. McGee's position.

## C. The false testimony violated Mr. Rhodes' due process rights.

Convictions based on testimony that scientific advancements later show was unreliable violate due process. In *Lee v. Tennis*, No, 4:CV-08-1972, 2014 WL 3894306 (M.D. Pa. Aug. 8, 2014), for example, the court granted habeas relief where the defendant was convicted based on arson science that, while accepted at the time of trial, was later shown to be unreliable. The post-conviction scientific evidence showed that the arson investigators responsible for Lee's case had relied on scientific principles that had since been "debunked" in the arson science field. *Lee v. Tennis*, No. 4:CV-08-1972, 2014 WL 3894306, at *3 (M.D. Pa. June 13, 2014) (Report and Recommendation).

In *Lee*, the district court found that the "admission of the fire expert testimony undermined the fundamental fairness of the entire trial . . . because the probative value of the fire expert evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission." *Id.* at *13. The court did not require that the defendant meet the extraordinarily high burden of showing "actual innocence," but rather looked to whether, "when this flawed and unreliable evidence is set aside, there remained 'ample evidence' of guilt upon which the jury could have relied." *Id.* at *15 (citing *Albrecht v. Horn*, 485 F.3d 103, 126 (3d Cir. 2007)). Moreover, the court considered whether "the remaining evidence of guilt

show[ed] that the government's case ha[d] not been 'meaningfully undermined' by the collapse of the fire science proof." *Id.*

Before that, in remanding for an evidentiary hearing, the Third Circuit recognized the potential due process violation in Lee's case, stating in its remand instructions: "If Lee's expert's independent analysis of the fire scene evidence—applying principles from new developments in fire science—shows that the fire expert testimony at Lee's trial was fundamentally unreliable, then Lee will be entitled to federal habeas relief on his due process claim." *Lee v. Glunt*, 667 F.3d 397, 407-08 (3d Cir. 2012). The Third Circuit affirmed the standard applied by the district court, holding that "[b]ecause the Commonwealth has not pointed to 'ample evidence' sufficient to prove guilt beyond a reasonable doubt, we affirm the District Court's grant of *habeas* relief." *Lee*, 798 F.3d at 169.

The Ninth Circuit has "join[ed] the Third Circuit in recognizing that habeas petitioners can allege a constitutional violation from the introduction of flawed expert testimony at trial if they show that the introduction of this evidence '"undermined the fundamental fairness of the entire trial."' *Gimenez v. Ochoa*, 821 F.3d 1136 (9th Cir. 2016) (quoting *Lee*, 798 F.3d at 162). The Ninth Circuit agreed with the Third Circuit that a claim of a due process violation stemming from the introduction of flawed expert testimony is different and separate from a free-standing actual-innocence claim. *Id.*; *see also Hanson v. Farwell*, No. 3:04-cv-

00130, 2017 U.S. Dist. LEXIS 86316, at *3-4 (D. Nev. June 6, 2017) ("Turning to Hanson's motion for an evidentiary hearing, the Court determines that an evidentiary hearing is warranted with respect to Hanson's contention that scientific advancement since the time of his trial has undermined expert testimony on which his conviction was based.").

The Texas Court of Criminal Appeals reached a similar conclusion in *Ex Parte Henderson*, 384 S.W.3d 833 (Tex. Crim. App. 2012). There, Henderson's murder conviction was based primarily on a medical examiner's testimony whose analysis and opinions were later undermined by developments in the science of biomechanics. *Id*. at 834. Due to the constitutional error inherent in relying on testimony that was not supported by current science, the appellate court agreed with the district court's recommendation to grant habeas relief and remanded for a new trial. *Id.*

In a concurring opinion, Judge Price described a due process "continuum." *Id.* at 835. At one end of the continuum is a claim that the State *knowingly* used false or perjured testimony, and the standard for materiality is relatively low. *Id.* On the other end of the continuum is a "bare claim of actual innocence," which requires meeting the "Herculean" standard of "extreme materiality." *Id.* In the middle of the continuum exists another category where the State makes "unknowing use of perjured or false testimony," and showing a due process

violation in this category requires a "mid-level standard (or standards) of materiality." *Id.* Judge Price found this standard met where the science had shifted such that the medical examiner's testimony was called into question.

Judge Cochran also filed a concurring opinion in *Henderson*, concluding that "[d]ue process was not violated at the time of trial, but nevertheless, the scientific testimony that supported a finding of 'homicide' in the original trial has been retracted." *Id.* at 844. This scientific uncertainty "casts a pall upon the basis for the jury's verdict and upon its accuracy." *Id.* Judge Cochran found it appropriate to grant a new trial because "[t]he present guilty verdict is based on scientifically unreliable evidence, but, after another capital murder trial, a guilty verdict could be based on scientifically reliable evidence or evidence that forthrightly admits that science cannot resolve the question of either causation or intent." *Id.* at 850. "Despite every participant's honesty and good faith, this . . . is a case that should be retried to ensure the accuracy of our verdicts and the integrity of our system." *Id*. at 850-51.

Mr. Rhodes is in the identical position. His conviction was the product of scientifically unreliable evidence and false statements propounded by experts. New evidence calls into question the legitimacy of the verdict. Under the legal standard Judge Price articulated in *Henderson*, which makes eminent sense, Mr. Rhodes need only show a mid-level of materiality to meet the threshold to establish a

constitutional violation. There is no question that Mr. Rhodes meets such a standard. Indeed, as Justice Anderson of the Minnesota Supreme Court observed in his dissenting opinion, Dr. McGee's opinion that Jane's hemorrhaging was caused by external force "was the most critically incriminating evidence of the entire trial." *Rhodes*, 875 N.W.2d at 793 (Anderson, J., dissenting).

### D. With the truth in hand, no jury would convict.

The State's use of unreliable and (now) demonstrably false evidence requires a new trial if Mr. Rhodes shows by clear and convincing evidence that, but for the constitutional errors, "no reasonable factfinder would have found [him] guilty of the underlying offense." 28 U.S.C. § 2254(e)(2); *see also Giglio v. United States*, 405 U.S. 150, 154 (1972) (presentation of false evidence requires a new trial if there is any "reasonable likelihood" that the false evidence affected the jury's decision) (citing *Napue v. Illinois*, 360 U.S. 264, 271 (1959)); *see also Young*, 17 F.3d at 1204 ("Thus, even if the government unwittingly presents false evidence, a defendant is entitled to a new trial if there is a reasonable probability that [without the evidence] the result of the proceeding would have been different.").

Here, Captain Chandler and Dr. McGee were the focal points of the State's circumstantial case. Captain Chandler's testimony was unquestionably material.

Indeed, in finding that the jury's verdict was supported by the evidence, the Minnesota Supreme Court specifically referenced Chandler's false testimony:

> [G]iven that Jane's body was found less than 13 hours after she went into Green Lake, she could not have fallen into the lake where Rhodes said she did because the depth of the water there was 40 feet and physical evidence proves that, under the circumstances, a body under 40 feet of water would not refloat for three to four weeks. . . . *The jury could have reasonably . . . believed the state's theory that Rhodes lied to the officials about the correct location to search.*

*State*, 657 N.W.2d at 840-41 (emphasis added).

In addition, Captain Chandler acknowledged that the "biggest" factor in his opinion was the water temperature, which we now know he testified to falsely. (Appx.67.) Had the temperature been warmer (as we now know it was), Chandler conceded that Jane's body could have resurfaced in 13 hours (as it did), which fully supports Mr. Rhodes' statements to the police regarding the location on Green Lake where Jane entered the water. (*Id.*) The notion that Mr. Rhodes deliberately misled police was premised on false evidence regarding water temperature.

Similarly, with respect to Dr. McGee, since Mr. Rhodes' 2001 post-conviction hearing, scientific literature has been published that is fully consistent with Mr. Rhodes statement that Jane's death was an accident. While the jury heard from a forensic pathologist who disagreed with Dr. McGee, that expert was unable

to support her conclusions with the new peer-reviewed conclusions. This evidence proves clearly and convincingly that the State's contention that Jane's neck hemorrhages could not have been caused by drowning is wrong.

Newly discovered evidence—the recent scientific studies and the shift in science that these studies represent and the experts who can now rely on them—substantially undermine the verdict, and show that Jane's death was a tragic accident—a tragedy that has been compounded by Mr. Rhodes spending over twenty years in prison for a crime he did not commit.

Notably, this is not the first time Dr. McGee has provided inaccurate testimony that resulted in a flawed conviction. In 2011, Douglas County Judge Peter Irvine vacated the conviction of Michael Hansen, who was convicted in 2006 of murdering his daughter based upon Dr. McGee's false or incorrect testimony.[9] *Hansen v. State*, No. 23-KX-04-1222, 2011 Minn. Dist. LEXIS 197, at \*16 (Minn. Dist. Ct. July 13, 2011).

Similarly, in 2003, a Wisconsin appellate court reversed the conviction of Evan Zimmerman, who was convicted of first-degree murder following the death of his girlfriend, based upon trial counsel's faulty failure to challenge Dr. McGee's

---

[9] As Mr. Rhodes does here, Mr. Hansen established his claim of false evidence by introducing testimony of several experts who disagreed with Dr. McGee's conclusions, as well as scientific literature published years after Mr. Hansen's conviction.

faulty testimony. *State v. Zimmerman*, 669 N.W.2d 762, 772 (Wis. Ct. App. 2003). At trial, Dr. McGee opined that a telephone cord found in Zimmerman's van could have been the murder weapon. *Id.* at 768. At the post-conviction hearing, however, Dr. Jeffrey Jentzen, then the Milwaukee Medical Examiner, explained that the telephone cord could not have been the murder weapon because the mark on the victim's neck was "a wide, webbed, fabric-like pattern and contained a buckle mark." *Id.* at 772. The state retried Zimmerman, but dismissed the case during its case-in-chief because, according to the prosecutor, the state lacked the ability to prove guilt beyond a reasonable doubt. (*See* Dee J. Hall, *Man Freed; Murder Charge is Dropped*, Wisc. State Journal (Apr. 30, 2005).)

The need for a new trial is particularly compelling here because, without the testimony from Dr. McGee and Captain Chandler, there is no evidence that *any* crime was committed. Forensic examinations of the boat did not show any evidence of assault (Appx.51-53), no eyewitnesses testified that they saw or heard any physical confrontation, multiple witnesses heard the couple laughing and having fun (Appx.25, 29, 32, 33, 34), there were no rips or tears in Jane's clothing, investigators found Jane's earring on the boat's floor (Appx.22-23), and all witnesses described Mr. Rhodes as being extraordinarily shaken as a result of the incident. (Appx.21, 42, 46.)

Moreover, the State's evidence of motive was weak. The State claimed Mr. Rhodes killed his wife for insurance money and because he was having an alleged extramarital affair. The evidence, however, showed that Jane applied for a $50,000 life-insurance policy a few days before the family vacation, but that policy *had not even issued* at the time of her death. Moreover, the only evidence presented about the supposed "affair" was that it never consummated and that it ended over a year before Jane's death when Mr. Rhodes cut off all contact to focus on his marriage. These "motives" were the weakest piece of the State's case and without the support of Dr. McGee's incorrect determination that the manner of death was homicide and Captain Chandler's false testimony that allowed the jury to believe Mr. Rhodes misled first responders, they would have never sustained a conviction. Given these circumstances, the newly discovered evidence that bears upon the two most critical aspects of the State's case clearly undermines any confidence in the verdict.

**E.      The District Court's rationale in denying the petition is erroneous.**

Despite the State offering false testimony and notwithstanding the shift in science, the District Court denied the Petition. In discounting the new medical studies, the Magistrate (whose reasoning the District Court adopted) largely relied on an affidavit from Dr. McGee. (Add.33.) But as the Magistrate correctly stated elsewhere in the Report and Recommendation, the only evidence that can be considered in a habeas petition is the trial evidence and any new evidence

proffered by the petitioner. Moreover, any disagreement by Dr. McGee presents a matter of evidentiary weight, which can adequately be addressed at an evidentiary hearing.

Further, the lower court's rationale suggests this case is still a "battle of experts." Perhaps this *was* a battle of experts at Mr. Rhodes' trial, in 1998, when two experts offered competing theories, neither of which was outside the norm for a forensic pathologist. The State relied on its expert pathologist to tell the jury that Jane Rhodes' internal neck hemorrhaging could not be explained by natural drowning (Appx.8), and instead was caused by Mr. Rhodes "knock[ing] [her] out of the boat with a blow to the neck." (Appx.71 (emphasis added).) This was a legitimate, if not prevailing, view at the time. But the science underlying forensic pathology has advanced so that there is now a *consensus* among experts that the State's theory was wrong: natural drowning causes neck hemorrhaging. The State's lynchpin evidence—the one thing it contended could not be explained by an accidental drowning—has been refuted. Particularly in light of the "reasonable doubt" standard, the new studies cast significant doubt on this verdict.

Mr. Rhodes' new evidence—a new scientific consensus—shows that the State's reliance on Dr. McGee's opinion testimony to argue that Jane's neck injuries "*had to be* caused by the brief application [by Mr. Rhodes] of compressive force" was wrong. (Appx.71 (emphasis added).) There is unanimity among scores

of forensic experts—excluding only Dr. McGee—that Jane's injuries were likely caused by drowning alone, and no other expert would have deemed this a homicide. This is not a new shade of gray; it is new evidence based on new scientific studies. Dr. McGee's prior opinion now conflicts with scientifically-accepted facts.

Second, the Magistrate emphasized that several of Mr. Rhodes' many experts used equivocal language in parts of their reports. (*Id.*) But any concern about equivocation, from two of the *seven* forensic experts, likewise goes to the *weight* of the evidence alleged, which must be evaluated, at the very least, at an evidentiary hearing where these experts and Dr. McGee would be allowed to testify, to be cross-examined, and to further explain their conclusions.

Third, the Magistrate concluded that, even with the new evidence, there is sufficient evidence in the record to sustain the conviction. But without the flawed testimony of Dr. McGee and the demonstrably false testimony of Captain Chandler, there is no evidence that *any* crime was committed. Again, forensics did not show evidence of assault (Appx.51-53), no eyewitnesses testified that they saw or heard a physical confrontation, multiple witnesses instead heard the couple having fun (Appx.25, 29, 32-34), there were no rips in Jane's clothing, investigators found Jane's earring in the boat (Appx.22-23), and all witnesses

described Mr. Rhodes as being extraordinarily shaken after the accident. (Appx.21, 42, 46.)

The newly discovered evidence that discredits the two most critical aspects of the State's case destroys any confidence in the verdict. The State presented two experts who both provided the jury with information crucial to the guilty verdict, each reinforcing the other. A man who would strike or choke his wife would impede rescue efforts; and a man who would impede rescue efforts would strike or choke his wife. This false narrative allowed the jury to weigh other circumstantial and unremarkable evidence as indicia of guilt—something no reasonable juror would have done in the absence of the State's false testimony. Mr. Rhodes is innocent, and he has toiled in jail for 20 years while evidence of his actual innocence piles up. On this record, the District Court should have ordered an evidentiary hearing. *Schlup v. Delo*, 513 U.S. 298, 316 (1995) (holding that a petitioner meets his burden by presenting evidence undermining confidence in the outcome.)

Finally, the Magistrate recommended denying Mr. Rhodes an evidentiary hearing because Mr. Rhodes was already able to develop the factual basis for his petition in state court. (Add.42-43.) The District Court adopted this reasoning. This, too, was error. Mr. Rhodes was not able to develop the factual basis in Minnesota state court. In fact, the state court refused to conduct any evidentiary

hearing, and the Supreme Court affirmed because, under governing state law, it was untimely. *Rhodes v. State*, 875 N.W.2d at 787-88.

That is our point. Mr. Rhodes has material new evidence directly bearing on his actual innocence. He is entitled to have a court hear from the witnesses themselves in an evidentiary hearing. Contrary to the Magistrate's Report and Recommendation (adopted by the District Court), 28 U.S.C. § 2254(e)(2) does not prohibit an evidentiary hearing here. That clause provides that "the court shall not hold an evidentiary hearing on the claim" if "the applicant has failed to develop the factual basis of a claim in State court proceedings."

Mr. Rhodes did not fail to do anything. His state-court claim was procedurally defaulted. Indeed, in *Williams v. Taylor*, 529 U.S. 420 (2000), the Supreme Court stated: "Under the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id*. at 432. That standard certainly is not met here. The District Court therefore misapplied section 2254(e)(2) in denying Mr. Rhodes an evidentiary hearing.

# CONCLUSION

The State's "wholly circumstantial" case against Mr. Rhodes is refuted by evidence that the jury never heard. The newly discovered evidence and literature demonstrate that the State's case against Mr. Rhodes was based on faulty science and misstated facts, and the resulting conviction violates Mr. Rhodes' rights under the Constitution's due process clause. The newly discovered evidence is clearly material. Had that evidence been available at Mr. Rhodes' original trial, no reasonable jury could have convicted him. For these reasons, this Court should reverse and grant Mr. Rhodes a new trial or, at a minimum, an evidentiary hearing.

**BASSFORD REMELE**
*A Professional Association*

Dated: January 29, 2019

By:  s/ Mark R. Bradford
     Mark R. Bradford (#335940)
100 South 5th Street, Suite 1500
Minneapolis, MN 55402-1254
612-333-3000
mbradford@bassford.com

and

**CARLSON, CASPERS, VANDENBURGH, LINDQUIST & SCHUMAN, P.A.**

Samuel T. Lockner (#0341095)
Alexandra J. Olson (#390145)
225 South 6th Street, Suite 4200
Minneapolis, MN 55402
(612) 436-9600
slockner@carlsoncaspers.com
aolson@carlsoncaspers.com

# CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

Pursuant to Rules 28(a)(10) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure, the undersigned counsel for Appellant Thomas Rhodes certifies that this brief complies with the requirements of Fed. R. App. P. 32(a)(7)(B) in that it is printed in a 14-point, proportionally spaced typeface (Times New Roman) utilizing Microsoft Office Word 2016. The brief contains 8,955 words, including all footnotes and excluding the Table of Contents, Table of Authorities, and this Certificate.

**BASSFORD REMELE**
*A Professional Association*

Dated: January 29, 2019

By: s/ Mark R. Bradford

Mark R. Bradford (#335940)
100 South 5th Street, Suite 1500
Minneapolis, MN 55402-1254
612-333-3000
mbradford@bassford.com

# APPELLANT'S CERTIFICATION OF VIRUS FREE

Pursuant to Rule 28A(h)(2) of the Eighth Circuit Rules of Appellate Procedure, the undersigned counsel for Appellees certifies that the attached Appellant's Brief and Addendum has been scanned for computer viruses and is virus-free.

**BASSFORD REMELE**
*A Professional Association*

Dated: January 29, 2019      By: s/ Mark R. Bradford

Mark R. Bradford (#335940)
100 South 5th Street, Suite 1500
Minneapolis, MN 55402-1254
612-333-3000
mbradford@bassford.com

**CERTIFICATE OF SERVICE**
**FOR DOCUMENTS FILED USING CM/ECF**

I hereby certify that on January 29, 2019, I electronically filed the foregoing

with the Clerk of the Court for the United States Court of Appeals for the Eighth

Circuit by using the CM/ECF system. Participants in the case who are registered

CM/ECF users will be served by the CM/ECF system.

**BASSFORD REMELE**
*A Professional Association*

Dated: January 29, 2019      By: s/ Mark R. Bradford

Mark R. Bradford (#335940)
100 South 5th Street, Suite 1500
Minneapolis, MN 55402-1254
612-333-3000
mbradford@bassford.com